ROBINSON, Plaintiff in error, v. STATE, Defendant in error.

*No. State 91. Argued September 14, 1971.—Decided October 8, 1971.*
(Also reported in 190 N. W. 2d 193.)

For the plaintiff in error there were briefs and oral argument by *James H. McDermott*, state public defender.

For the defendant in error the cause was argued by *George L. Frederick*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

CONNOR T. HANSEN, J. In the early morning hours of February 13, 1969, police officer Robert Moe was summoned to a residence in Milwaukee. In response to a cry for help from within the house, he entered three times by way of the back porch, but was confronted each time by the defendant, who, armed with a revolver, threatened to kill him unless he got off the porch. While Officer Moe was waiting for assistance, the defendant appeared at the rear doorway of the house, pointing a gun at the head of Carl Crawford, defendant's brother-in-law. Moe testified that the defendant began waving the gun around and shouted, "I could kill a cop anytime I wanted to." This is corroborated by the testimony of Crawford. A short time later, other officers arrived at the scene, including Sergeants David Guerin and Frank Miller. After attempts had been made to gain entrance by pleading with someone in the house to open the door, the officers forced the rear door open, while a canister of tear gas was simultaneously thrown through the kitchen window.

There is some contradiction in the testimony as to what transpired after the officers entered the dwelling. Guerin, Miller and the defendant were in the same room and both officers testified they told the defendant to drop the gun. Guerin testified the gun was pointed direct-

ly at Miller and that he observed the defendant make a motion with his trigger finger on the gun. Sergeant Miller testified that just before he moved toward the defendant he heard a "click" which, in his opinion, sounded like a misfire. Immediately thereafter Guerin leaped at the defendant, grabbing him about the neck. Miller grabbed for the defendant's arm and the gun clattered to the stove.

Defendant testified that he was drunk and confused at the time of the incident, and that he had smoked three sticks of marijuana. The gun belonged to his brother, and he initially took it to revenge an alleged rape of a girl friend, which had occurred approximately two weeks prior to February 12, 1969. Defendant recalled telling Officer Moe to get off the porch; holding the gun on Crawford at the doorway, and saying something to the effect that he could have shot either of the officers then present. He further testified that when the tear gas canister came through the window, he was standing in the bedroom doorway and turned around and pointed the gun at the doorway in an effort to get the drop on the officers as they came in, but he saw the officers were already in the room. He also testified that he did not attempt to fire the gun at any time after Sergeant Miller entered the kitchen.

The gun involved in the instant case was a .22-caliber, rimfire, double-action revolver, and the cylinder could turn without the necessity of pulling the trigger or cocking the gun. The gun was introduced in evidence. Sergeant Miller testified that when he examined the gun after the incident, it contained three live cartridges and three spent cartridges; that one of the live cartridges had a dent on the rim. The record also discloses that the defendant had fired one of the expended cartridges in the house before the officers arrived.

A firearms expert of the state crime laboratory testified as to functioning of the weapon. He described

and demonstrated various "click" sounds made by the operation of the weapon. Various police officers, the defendant, and both counsel, also used the gun for various demonstrations during the trial.

Defendant, on appeal, alleges a number of errors; however, the state argues the defendant is foreclosed from doing so because defendant failed to timely preserve his right to appeal.

The jury returned a verdict of guilty on June 26, 1969. The court adjourned the matter to the following day to consider motions after verdict, if any, by defendant's counsel. The judgment roll reflects that on June 27th, "On motion of the state, the court pronounced judgment on the verdict and entered jury conviction of guilt of the offense as charged in the information." However, the record does not indicate any decision on motion for judgment by the court on June 27, 1969. The court ordered a presentence investigation and sentencing took place on July 21, 1969. On July 21, 1969, the court adjudged the defendant guilty and imposed sentence. The writ of error to review the judgment of conviction was issued June 23, 1970.

June 17, 1970, defendant moved the trial court for an order dismissing the action and for a judgment of acquittal, notwithstanding the verdict, and, in the alternative, for an order setting aside the verdict and granting a new trial.

June 25, 1970, defendant moved the court for an order granting authority to contact the jurors.

July 21, 1970, both of the foregoing motions were denied by the trial court, and a writ of error to review the trial court's denial of these motions was issued July 23, 1970.

We are mindful of the decisions to which counsel has directed our attention, and we are of the opinion they are readily distinguishable from the instant case. We

find no substance to the state's arguments and hold that in this case the appeal was timely.

In our previous decisions, we have recognized an apparent inconsistency among the trial courts of the state in the manner of adjudicating guilt.[1] Sec. 972.13, Stats., effective July 1, 1970, provides a uniform and formal procedure for adjudicating guilt which is intended to alleviate the problem here presented.

*Was it error to allow the gun herein involved (state's Exhibit 1) to go to the jury room?*

The record reveals that the gun, without the cartridges, was sent to the jury room during deliberation, over the objection of defense counsel. Under the facts of this case, we consider the decision to permit the weapon to go to the jury room to be a decision addressed to the judicial discretion of the trial judge.

We do not consider that our determination in this case in any way modifies or deviates from the well-established rule which prohibits a jury from going outside the evidence and conducting experiments on its own.

Assuming, as contended by defendant, that experimentation was conducted by the jury, could any conceivable experimentation be conducted which would constitute prejudicial error? We think not.

McCormick, *Evidence* (hornbook series), pp. 393, 394, sec. 184, states that:

" . . . [M]ost jurisdictions allow the judge in his discretion to determine whether a given document or exhibit shall be sent with the jury. . . .

" . . .

"As to the use to which the jury may put the writings and exhibits, it seems that they may test the validity of

---

[1] *State v. Charette* (1971), 51 Wis. 2d 531, 187 N. W. 2d 203; *Spiller v. State* (1971), 49 Wis. 2d 372, 182 N. W. 2d 242; *State v. Wollmer* (1970), 46 Wis. 2d 334, 174 N. W. 2d 491.

the inferences for which such items of evidence are offered, by examining them, and by such reasonable manipulation or experimentation as is appropriate for the purpose. [Citations omitted.]"

It is the rule in Wisconsin that permitting exhibits to be taken to the jury room is within the sound discretion of the trial court. *Payne v. State* (1929), 199 Wis. 615, 227 N. W. 258; *Milwaukee Tank Works v. Metals Coating Co.* (1928), 196 Wis. 191, 218 N. W. 835; *Wunderlich v. Palatine Fire Ins. Co.* (1899), 104 Wis. 382, 80 N. W. 467.

We do not here review the facts surrounding the trial court's decision to permit the weapon to go to the jury room. The reason being that the well-reasoned opinion of the trial court in stating its reasons for allowing the gun to go to the jury room is more than adequate.

"[*The Court:*] . . . We had a use of that gun during the trial by just about everybody but the judge who participated in that trial. We had it held by the defendant and demonstrated, we had it held by the expert and demonstrated, we had it held by the attorneys and use of it made in argument and in asking questions. We had it held by Officer Guerin and Officer Miller. . . . We had various clicks demonstrated, we had a click of the hammer being pulled back, we had a click of the completed firing of the revolver which is what Officer Miller designated as a misfire or a dry fire, striking metal on metal. We had the expert demonstrate the use of the cylinder on examination by [Defense counsel] to show that in his opinion the cylinder could revolve or turn when it is placed in the pocket, if it is done properly. We had the opinion by the expert that when it was knocked out of the defendant's hand by Officer Miller and Officer Guerin as I recall and went to the stove or however it was dislodged from his hand or taken from his hand that cylinder could have turned in that action. This became critical because of the state's theory that the one shell that appeared as a misfire was a rimfire and there was a slight indentation or an indentation in the rim, that that is what occurred at the time that the trigger was pulled when it was pointed at Officer Miller. . . .

". . . What I am getting at is this: If a jury needs testimony read back, the court can have testimony read back, it is recorded. As we discussed earlier this morning we don't have tape recorders in the courts in Wisconsin, I cannot play back the intensity, the volume or the nature of a click. . . . [T]here were clicks heard by them on each of the separate days even down to the final arguments in this case and in allowing—and there was the expert testimony which we tell them in Wisconsin and in instructions that they don't have to accept the opinions of experts, those opinions are given to them to assist them if, in fact, it assists them but they need not believe it. These were the significant areas I just mentioned before, the expert's testimony about the 17 pounds pull for the trigger, the six pounds pull for the hammer, the ease with which the cylinder rotated, the marks on the shell casings, the different sounds that he demonstrated. . . . I could not in my mind conjure up any experimentation that the jury could have done in that jury room with that revolver that wasn't done for them here in court knowing of no new experimentation that I could, in fact, conjure up in my mind that they would be doing these things in testing credibility of witnesses."

We find no abuse of discretion by the trial court in permitting the exhibit to go to the jury room.

*Order disallowing defense counsel
leave to contact jurors.*

The trial court denied defendant's postconviction motion for an order granting authority to contact jurors and use their testimony or affidavits in connection with defendant's postconviction motions.

Defendant acknowledges the general rule expressed by this court in *Boller v. Cofrances* (1969), 42 Wis. 2d 170, 166 N. W. 2d 129, against impeachment of a jury verdict.

Our attention is directed to *United States v. Beach* (4th Cir. 1961), 296 Fed. 2d 153, for authority that the instant case qualifies as an exception to that rule. We believe *Beach* is distinguishable. Electric adding machines were introduced in evidence and the trial court permitted

them to go to the jury. The jury requested and received an electric cord to make them function to test the sound. In the home where the adding machines were operated, they were placed on a foam rubber pad some two inches in thickness. The record did not indicate whether the two-inch foam rubber pad (which also went to the jury) was used in any experiments which might have been conducted by the jury. Also, from the decision it cannot be determined whether any experiments with the adding machines were conducted during the trial. On appeal, the cause was remanded for a determination of whether in fact the jury had performed experimentation. It was further held that a direct court inquiry of the jurors would be proper in this regard, relying on the distinction made in *Perry v. Bailey* (1874), 12 Kan. 539, 545:

" 'Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors; if one affirms misconduct, the remaining eleven can deny; one cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard. Under this view of the law the affidavits were properly received. They tended to prove something which did not essentially inhere in the verdict, an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one.' " *United States v. Beach, supra,* 160.

This holding is consistent with the exception to the general rule recognized in *Ford Motor Credit Co. v. Amodt* (1966), 29 Wis. 2d 441, 450, 451, 139 N. W. 2d 6, and reaffirmed in *Boller:*

". . . We recognize, however, that in some situations (such as *Sawyer* and *Cullen*) jurors may properly be subject to interrogation by the court to determine if an irregularity occurred; however, trial courts should limit such inquiries to those cases in which the court is persuaded (1) that substantial personal awareness of the alleged impropriety is within the direct and independent knowledge of one who did not serve as a member of the jury, (2) that such knowledge was not derived by such person from a juror after the jury's discharge, and (3) that the challenge to the integrity of the verdict originated from such person rather than from a juror. Thus, jurors may sometimes be required to confirm or deny someone else's attack upon their verdict, but they themselves may never embark on a course which will impeach their verdict."

The instant case does not fall within the above exception, and we find no error in the trial court's determination.

### Questioning witness outside presence of jury.

The following question was asked of Officer Guerin by defense counsel outside the presence of the jury:

"*The Court*: You are already under oath, Officer Guerin. [Defense counsel], you had a question or two more for the officer?
"[*Defendant's Attorney*]: Yes, your Honor.
"*Q.* Officer Guerin, directing your attention to what has been marked as state's Exhibit No. 1 for identification, you testified earlier that you observed some pressure which you might call the trigger finger, the finger you observed over the trigger. Would you tell me whether or not you observed the cylinder turn at all from that time.
"*The Witness*: From my point of view, no sir, I did not.
"[*Defendant's Attorney*]: Fine, I have nothing further."

Defendant argues that because the jury did not hear the above testimony, defendant was denied his constitu-

tional right to a jury trial. Testimony of defense counsel on hearing postconviction motions reflects that failure to present the foregoing testimony to the jury was an inadvertent omission.

The testimony inadvertently omitted would not have materially altered the outcome of the trial. Sergeant Guerin had previously testified that he could not recall seeing the hammer of the gun go back or of hearing the gun click. Sergeant Miller testified that he did not see the hammer go back or the cylinder turn. It is obvious that the jury believed Sergeant Miller when he stated that he heard a click of the gun and the inability to see or the actual observation of Sergeant Guerin with respect to the turning of the cylinder would not have substantially taken away from Sergeant Miller's testimony.

In *Logan v. State* (1969), 43 Wis. 2d 128, 168 N. W. 2d 171, relied on by appellant, defense counsel was confused and mistaken about the mechanics of eliciting certain admissible testimony. The testimony was highly probative and could have materially altered the outcome of the trial. This court ordered a new trial in the interest of justice. In the instant case, defense counsel was not confused with respect to eliciting the testimony in the presence of the jury. Error cannot be predicated on omission of testimony which was never proffered as evidence for the jury to hear; nor can it be predicated on the taking of such testimony outside the presence of the jury, at least by defense counsel. Omission of such testimony may, however, if highly probative, be the basis for a new trial in the interest of justice as was the case in *Logan*.

The remaining issues raised by defendant have been considered and found to be without arguable merit and without significant effect upon the judgment and verdict reached in this case.

A review of the entire record leads us to the conclusion that the defendant was properly convicted of the crime

charged. We find nothing to indicate that justice has not been well served by this conviction, nor is there any evidence to indicate that a different result would obtain under optimum circumstances. No miscarriage of justice has occurred which would warrant a new trial under sec. 251.09, Stats.

*By the Court.*—Judgment and order affirmed.