STATE, Plaintiff-Respondent, v. DIX, Defendant-Appellant.†

Supreme Court

*No. 76–659–CR. Argued November 28, 1978.—*
*Decided January 9, 1979.*
(Also reported in 273 N.W.2d 250.)

† Motion for reconsideration denied, without costs, on February 27, 1979.

479

For the appellant the cause was argued by *Jack E. Schairer,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the respondent the cause was argued by *Edward S. Marion,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

CONNOR T. HANSEN, J.  On January 11, 1975, in the early morning hours, Kaiser Dix was arrested at the scene of an auto accident. He was charged with attempted first-degree murder and armed robbery in connection with two incidents which occurred shortly before his arrest. Dix entered pleas of not guilty and not guilty by reason of mental disease or defect. Several police officers, the two victims and their doctors testified at trial.

The first victim, Karen Nielsen, testified that she was attacked as she returned home from bowling about 1:26 a.m. on January 11, 1975. She was stabbed by her attacker and told to shut up when she screamed. She at-

tempted to fight off the attack by swinging her bowling bag at the man. He fled with the bag which contained a beer can with change in it. Karen Nielsen was stabbed seven times, three times in the arm, once in the shoulder, once in the back, once in the hip and once in the ribs. She was hospitalized for about a week with a punctured lung.

Linda Knudson was attacked at about 2 a.m. on the same date and in a similar manner. She said she was walking from her car to her front door when a man came up behind her, grabbed her around the neck and put a knife to her throat. He told her to shut up and she told him he could have her purse. He started shoving her around to the back of the house, then told her to get on the ground. She began to scream and he stabbed her, six times in all, twice in the hand, three times in the back and once on the leg. He took her purse and fled. Linda was treated at an emergency room and released.

Linda Knudson had been able to supply police with a description of the car that had pulled into a parking lot next to her home just prior to the attack. Tire marks in that parking lot matched those at the scene of Dix's accident. Dix permitted police to search his car and the beer can of coins was found along with a knife. The next day Linda Knudson's purse was found in a yard near the scene of the accident. When arrested, Dix had blood and cuts on his hands. Both victims were able to identify Dix at the hospital.

Dix also relied upon an alibi as a defense. He testified that he had spent part of the evening drinking at the Holiday Inn in Kenosha, had picked up a woman hitchhiker on his way home and had dropped her off at her home. He said he then was chased and shot at by someone driving a gold Nova, which accounted for his running off the road. He said he found the bowling bag by the

side of the road and had kept the coins but left the bag where he found it. He also attempted to show that he was subject to black-outs which lasted several hours and after which he would have no memory of the events that occurred. The jury found Dix guilty on all four counts.

At the sanity portion of the trial, the defense presented a psychiatrist who testified that Dix suffered from a disassociative reaction which was triggered by sound following use of a mood-altering substance such as alcohol. He said that during these episodes another personality would take over and do things Dix would normally not be able to do. He said because of this mental disease or defect, while under the influence of alcohol, Dix was unable to conform his conduct to the requirements of law. The psychiatrist explained that partial amnesia would follow these episodes and that Dix would distort the facts he remembered and create a different version of the events.

The court-appointed psychiatrist's written report was given to the jury. He stated that Dix had an explosive personality and a probable history of problem drinking. The report further stated that Dix might be subject to episodes of alcoholic amnesia and if that were so he would be unable to conform his conduct to the requirements of law while intoxicated.

The jury found that Dix was not suffering from a mental disease or defect at the time he committed a crime. The finding is not challenged on appeal.

Motions after verdict included a challenge to a jury instruction and charges of misconduct by the judge and the bailiffs. The facts relating to these issues will be further considered.

The issues on appeal are:

1. Was the evidence sufficient to sustain the attempted murder and armed robbery convictions as to Linda Knudson?

2. Did the court commit reversible error in elaborating on the standard jury instruction on attempt?

3. Is it a denial of due process to require the defendant to shoulder the burden of proving mental disease or defect?

4. Is the appellant entitled to a new trial because of alleged comunications (a) between the bailiffs and the jury? (b) between the judge and a juror?

Appellant contends that the state failed to prove the elements necessary for convictions of attempted first-degree murder and armed robbery.

The test for sufficiency of the evidence is whether:

" '. . . the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt. . . . The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of the facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true.

" '. . . Stating the rule conversely for the sake of clarity, the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." '. . ." *Krueger v. State,* 84 Wis.2d 272, 282, 283, 267 N.W.2d 602 (1978).

Two elements must be established to sustain a conviction of attempted first-degree murder: (1) A specific intent to take the life of another, and (2) an unequivocal act which, except for the intervention of some extraneous factor, would have resulted in the death of that person. *Simpson v. State,* 83 Wis.2d 494, 514, 266 N.W.2d 270 (1978). The presumption that a person

intends the natural and probable consequences of those acts he voluntarily and knowingly performs may be applied in an attempted murder case. *Id.* at 514; *Smith v. State,* 69 Wis.2d 297, 304, 230 N.W.2d 858 (1975). Where the act is an assault with a deadly weapon the presumption is that there was an intent to kill. *Fells v. State,* 65 Wis.2d 525, 534, 223 N.W.2d 507 (1974); *Zebrowski v. State,* 50 Wis.2d 715, 722, 185 N.W.2d 545 (1971). It is not necessary that this intent be voiced by the actor where his actions imply a threat to cause physical injury. *Fells, supra,* at 535, 536.

Appellant argues that the state failed to prove the unequivocal act element because the knife wounds inflicted upon Knudson were not of a sufficiently aggravated nature. Appellant cites nine attempted murder cases as examples of conduct which provided justification for the charge. A gun is involved in each of those cases. The fact that a knife was used here is not sufficient basis on which to distinguish the case. Appellant misunderstands the nature of the charge. Attempted first-degree murder does not require that injuries of any particular degree of severity result. Convictions for attempted first-degree murder have resulted where the defendant attempted to shoot someone but failed and the victim went unscathed. *See, e.g., Robinson v. State,* 52 Wis.2d 478, 190 N.W.2d 193 (1971); *Holmes v. State,* 63 Wis.2d 389, 217 N.W.2d 657 (1974). As the court explained in *Huebner v. State,* 33 Wis.2d 505, 520, 147 N.W.2d 646 (1967):

". . . Since all attempts to commit crimes are failures to do so, a failure excuses a defendant who attempts a crime only when his actual attempt is incomplete, rather than unsuccessful. Within the contemplation of this section an attempt is complete when the defendant, with intent to commit a crime, takes action in furtherance of such intent and the failure to accomplish the crime is

due to a factor beyond his control or one unknown to him. . . ."

An unequivocal act is clearly shown here. Appellant forced Linda Knudson to the ground and stabbed her three times in the back, twice in the hand and once in the leg. Although the resulting wounds did not require hospitalization, they were serious enough to require stitches and the wounds in her back were deep enough to require drainage tubes. The evidence does not suggest that the appellant was purposely avoiding inflicting a mortal wound. Linda testified that she struggled and screamed while she was being stabbed. When Dix first attacked Linda in front of her house she offered him her purse. The stabbing took place after he had forced her to the back of the house, out of sight. The jury could reasonably infer an intent to kill from these facts.

Appellant also challenges the evidence of armed robbery. Sec. 943.32, Stats., reads in part:

"943.32 **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; or

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) Whoever violates sub. (1) while armed with a dangerous weapon may be imprisoned not more than 30 years."

Appellant does not challenge the finding that he was armed with a dangerous weapon or took property from a person. Dix bases this challenge on the fact that when he first attacked Linda in front of her house, she offered

to give him her purse without his demanding possession of it. Therefore, he argues, there is no intent to steal or threat or use of force to overcome the victim's resistance.

However, the facts show evidence of a use of force to overcome Linda Knudson's resistance. She was grabbed around the neck from behind and a knife was placed to her throat. That the appellant possessed an unlawful intent when he attacked Linda is clear. The intent to steal is reasonably inferred from the fact that he actually did take her purse after forcing her to the back of the house. There is no suggestion that he took it accidentally or unintentionally. The appellant did use force and the jury could reasonably conclude that robbery was a motive; he did take her purse and he was armed with a dangerous weapon. It was not unreasonable for the jury to find an intent to steal.

The appellant next argues that the following portion of the trial court's instruction to the jury on "extraneous factor" was prejudicial:

"An 'extraneous factor' is something outside the knowledge of the defendant or outside of his control, which prevented the completion of the crime or caused the defendant to desist in his commission of the crime. *In other words, a person might evade the acts of someone who intended to perform a particular crime. That is, the victim might be successful in evading.*" (Emphasis added.)

Appellant contends that by adding the emphasized language the trial court suggested a specific application of the law to the evidence in the case and did not make it clear that this was a question of fact to be resolved by the jury.

Sec. 805.13(3), Stats., provides:

"805.13 **Jury instructions; form of verdict.** (1) STATEMENTS BY JUDGE. After the trial jury is sworn,

all statements or comments by the judge to the jury or in their presence relating to the case shall be on the record.

"`. . .`

"(3) INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."

This case was tried on February 23 to 27, 1976. The foregoing statute was applicable to a trial held after January 1, 1976, and in his decision the trial court indicated that repeated consultations took place regarding the instructions. This same rule had been established by prior case law but this court had held that failure to so advise the attorneys must result in actual harm or prejudice to the defendant in order to claim error. *State v. Simpson,* 56 Wis.2d 27, 41, 42, 201 N.W.2d 558 (1972).

The trial court has great discretion in the choice of language and emphasis in framing jury instructions. *Aetna Cas. & Sur. Co. v. Osborne-McMillan Elevator Co.,* 35 Wis.2d 517, 529, 151 N.W.2d 113 (1967); *Webb v. Wisconsin Southern Gas Co.,* 27 Wis.2d 343, 350, 351, 134 N.W.2d 407 (1965). The purpose of the instructions is to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence. *Carlson v. Drews of Hales Corners, Inc.,* 48 Wis.2d 408, 416, 180 N.W.2d 546

(1970); *Webb, supra,* at 351. The instructions should be specific and tailored to the evidence. *West Bend Mut. Ins. Co. v. Christensen,* 58 Wis.2d 395, 398, 206 N.W.2d 202 (1973); *Lawrence v. Jewell Companies, Inc.,* 53 Wis.2d 656, 659, 193 N.W.2d 695 (1972).

". . . In any event no trial court is obliged to mouth a magic formula and fail to do so at its peril. It is the feeling of this court that it is the better practice to tailor an instruction to the facts at hand in a manner that is most meaningful under the circumstances. The instruction used embodied the substance of the rule of law, properly related it to the facts, and that is all that is necessary. . . ." *Kink v. Combs,* 28 Wis.2d 65, 76, 135 N.W.2d 789 (1965).

Specific evidentiary facts may be incorporated into an instruction provided they do not lead the jury to believe the court has prejudged the evidence. *Carlson, supra,* at 415; *Webb, supra,* at 351. A jury should not be required to guess at the meaning of technical words and, where appropriate, a statutory definition should be included. *Court v. State,* 51 Wis.2d 683, 700, 188 N.W.2d 475 (1971). It may also be appropriate and is therefore not error to include this court's interpretation of the law in relation to a specific set of facts. *Carlson, supra,* at 416; *Aetna Cas. & Sur. Co. v. Osborne-McMillan, supra,* at 528.

In discussing the "extraneous factor" of sec. 939.32 (2), Stats., this court has said that it "contemplates some circumstance which is beyond the control of the defendant." *Adams v. State,* 57 Wis.2d 515, 523, 204 N.W.2d 657 (1973). In evaluating a possible extraneous factor the issue is whether the defendant abandoned his efforts or was prevented from successfully carrying out the crime by circumstances beyond his control. *Id.* at

523. In *State v. Damms*, 9 Wis.2d 183, 190, 100 N.W.2d 592 (1960), it was stated that the fact that a gun was unloaded was an extraneous factor if the actor actually believed the gun was loaded at the time. In *Boyles v. State*, 46 Wis.2d 473, 476, 175 N.W.2d 277 (1970), the defendant threatened the victim and the victim saw part of the gun. The inability of the defendant to get the gun out of his pocket before the victim ran to safety was held to be an extraneous factor. The victim in *Adams, supra*, was struggling with her attacker and managed to deter him by kicking him in the mouth. At page 523, this court said:

"We are satisfied here that the resistance offered by the complainant constituted a valid extraneous factor within the contemplation of sec. 939.32(2), Stats."

Similarly an intended victim's refusal to get into the defendant's car was found to be an extraneous factor because the defendant did not abandon his efforts, but rather the victim withdrew. *Huebner, supra*, at 520.

By instructing the jury that a victim's successful evasive action could be considered an extraneous factor the court was correctly informing them of this court's interpretation of law. This additional instruction was particularly appropriate in this case where no other evidence of an extraneous factor was given. The added instruction was a correct statement of the law and it did not refer to specific evidence so as to give it undue emphasis. It is not framed in language which could suggest to the jury that they had to find Knudson's and Nielsen's struggles were extraneous factors. The instruction stated a rule of law that could be applicable to the facts of this case. It was not error and did not prejudice the appellant.

Appellant further argues that the burden of proof of mental disease or defect was unconstitutionally shifted to him. He contends that the state must prove his sanity beyond a reasonable doubt. He relies for this argument on the Supreme Court's holdings in *Mullaney v. Wilbur*, 421 U.S. 684 (1975), that it is unconstitutional to place the burden of proving provocation on the defendant, and *In re Winship*, 397 U.S. 358 (1970), that the reasonable doubt standard is of constitutional dimension. The appellant says this argument was also raised in *Grover Lee Crain v. State*, then pending before this court. The *Crain Case* was affirmed without an opinion because this issue was decided in *Patterson v. New York*, 432 U.S. 197 (1977). In *Patterson* the United States Supreme Court held:

"Subsequently, the Court confirmed that it remained constitutional to burden the defendant with proving his insanity defense when it dismissed, as not raising a substantial federal question, a case in which the appellant specifically challenged the continuing validity of *Leland v. Oregon*. This occurred in *Rivera v. Delaware*, 429 U.S. 877, 50 L. Ed.2d 160, 97 S. Ct. 226 (1976), an appeal from a Delaware conviction which, in reliance on *Leland*, had been affirmed by the Delaware Supreme Court over the claim that the Delaware statute was unconstitutional because it burdened the defendant with proving his affirmative defense of insanity by a preponderance of the evidence. The claim in this Court was that *Leland* had been overruled by *Winship* and *Mullaney*. We dismissed the appeal as not presenting a substantial federal question. *Cf. Hicks v. Miranda*, 422 U.S. 332, 344, 45 L. Ed2d 223, 95 S. Ct. 2281 (1975)." *Id.* at 204.

This holding effectively resolves the issue raised by the appellant.

Finally, appellant contends that communications which occurred between the judge and a juror and between the

bailiff and several jurors were probably prejudicial and that the state has not shown these communications to be harmless.

The United States Supreme Court held in *Parker v. Gladden*, 385 U.S. 363 (1966), that a communication between the bailiff and the jury could involve " 'such a probability that prejudice will result that it is deemed inherently lacking in due process.' . . ." *Id.* at 365. This holding was based on the fact that such " 'private talk' " which reaches the jury by " 'outside influence' " deprives a defendant of the rights of confrontation and cross-examination, fundamental requirements of a fair trial. In *Parker* it was undisputed that the bailiff had said " 'Oh that wicked fellow . . . he is guilty' " and " 'If there is anything wrong [in finding the petitioner guilty] the Supreme Court will correct it.' " *Id.* at 363, 364. These remarks were heard by three jurors and one alternate juror. In reversing the conviction the Supreme Court noted that the official character of the bailiff as an officer of the court carries great weight with a jury, that the jury deliberated at length (26 hours) and that one juror admitted to being prejudiced by the bailiff's remarks.

In an earlier case, *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court set standards for evaluating outside communications with jurors:

"In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice

to and hearing of the defendant, that such contact with the juror was harmless to the defendant. . . ." *Id.* at 229.

The court said where such a communication is alleged the trial court should determine, in a hearing with all parties, the circumstances, the impact on the juror and whether prejudice resulted. *Id.* at 230. Of course, a juror may only testify to the existence of such a communication and not to the influence it had upon him. *Mattox v. United States*, 146 U.S. 140, 149 (1892) ; *Robinson v. State*, 52 Wis.2d 478, 486, 487, 190 N.W.2d 193 (1971).

In *Shelton v. State*, 50 Wis.2d 43, 51, 183 N.W.2d 87 (1971), the court expressly adopted a rule which requires a showing of probable prejudice.[1] In *Shelton* the alleged error concerned disparaging remarks regarding the trial procedure made by two alternate jurors. It appeared that the other jurors had not heard the remarks and they were instructed to disregard them if they had.

In *State v. Stewart*, 56 Wis.2d 278, 284, 201 N.W.2d 754 (1972), a judge's response to a jury question that he did not know why a document placed in evidence had a name different from the defendant's on it was held to be nonprejudicial because it was an innocuous answer which gave the jury no substantive information.

In *Nyberg v. State*, 75 Wis.2d 400, 249 N.W.2d 524 (1977), prior to the opening statements the state's principal witness initiated a conversation with two jurors. The conversation was social and did not concern the

---

[1] This rule had been previously adopted in a civil case, *Seitz v. Seitz*, 35 Wis.2d 282, 306, 151 N.W.2d 86 (1967). The position that prejudice is necessary for a reversal was taken earlier in criminal cases. *See, e.g., Cullen v. State*, 26 Wis.2d 652, 660, 661, 133 N.W.2d 284 (1965); *Pollack v. Olson*, 20 Wis.2d 394, 401, 122 N.W.2d 426 (1963).

trial. This court concluded that the witness' attempt to ingratiate himself with the jury was improper but did not result in prejudice. This court observed that the trial court had examined the jurors involved, found that the conversation was unsolicited and did not involve the trial and that the jurors were not aware that the man was to appear as a witness.

In the case now before us, in a post-trial motion, appellant alleged judicial misconduct based on the fact that on February 27th, during the sanity portion of the trial, but before that issue was submitted to the jury, the judge was seen at lunch by a public defender speaking to one of the jurors. The trial judge filed a statement in which he stated he did not realize the man was a juror until near the end of the conversation and that they did not discuss the case but limited the subject of their conversation to a mutual acquaintance. This alleged error is not relied upon on appeal because the appellant correctly concludes he has not established a factual basis to show prejudice.

Nevertheless, the appellant suggests that *United States v. United States Gypsum Co.*, — U.S. —, 57 L. Ed.2d 854 (1978), is applicable here. That case involved a private conference between the judge and a jury foreman on the seventh day of deliberations in which the judge gave the foreman the impression that he wanted a verdict one way or the other. A verdict was returned the following morning. The case is clearly distinguishable on its facts. Although the meeting was unfortunate, there is absolutely no showing that it had any effect on the verdict or was prejudicial to the defendant in any way.

Appellant next alleges judicial misconduct by the judge by contending that the judge told two women jurors on the morning of the sanity trial that he was pleased with

their guilty verdict. This is not an accurate summary of the testimony.

The whole question of improper communications with the jury arose because an alternate juror, who was married to a lawyer, spoke to her husband following the trial about several conversations that took place in the jury room which she felt were improper. Her husband suggested she call the judge about them, which she did.

She appeared at a hearing before the trial judge on April 6, 1976. She was represented by one of her husband's partners and both trial counsel were permitted to question her. With regard to the incident now alleged as judicial misconduct, the alternate juror testified that she had been told that on Friday morning, February 27th, two women jurors expressed surprise, as they entered the jury room, that the judge had spoken to them in the hall. She further testified the bailiff then said that it was okay for the judge to say hello and that the judge was happy with their verdict because that was the one he wanted.

The jurors were questioned at a hearing on April 13, 1976, about this incident and several others that the alternate juror said had occurred. With regard to this incident involving the judge's remarks, five jurors recalled the judge telling them, as they left the building on Thursday night after rendering their verdict, that they were a good jury. None of the jurors recalled a bailiff commenting on the judge's reaction to the verdict, but one juror thought another juror had said the judge was happy with the verdict.

We have examined the record of the April 13, 1976, hearing and considered the written decision of the trial court following the hearing. In our review of the record we have considered each of the incidents which the alternate juror alleged to have occurred. Several of them relate to remarks alleged to have been made by Bailiff

Stuebe and which no juror other than the alternate juror recalled hearing. Since we conclude that incidents, neither individually nor in totality, constitute a showing of probable prejudice to the defendant, we deem it unnecessary to review them individually and in detail. However, we have no hesitancy in observing that the conduct of Bailiff Stuebe and Bailiff Denman during this trial did not meet the high standards placed upon bailiffs in fulfilling their important obligations to the cause of justice. Had they conducted themselves with proper decorum in relations with the jurors throughout the trial, this issue would not be before us for review.

Our review of the testimony of the jurors at the April 13, 1976, hearing leads us to conclude that none of the alleged remarks affected them the way they did the alternate juror. As the trial judge observed, the fact that she was married to a lawyer may have made her somewhat more sensitive.

The trial judge's remarks to some of the jurors that they had been a good jury, while inappropriate at the time, was made after the guilty verdict was rendered so could not have affected that verdict. It was not made as an approval of the verdict and the testimony of the jurors reflects that it was not considered as such by those who heard it. After the trial on the sanity portion of the trial, the jurors deliberated six hours. This evidences that their verdict was reached only after a careful analysis of the evidence.

We are of the opinion there has been no showing of probable prejudice to the appellant, *Shelton v. State, supra,* at 51, that the remarks were so prejudicial to the appellant as to result in a denial of due process. *Parker v. Gladden, supra.* The judgment and order of the trial court are affirmed.

*By the Court.*—Judgment and order affirmed.